IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| UNITED STATES OF AMERICA, | ) |
| | ) |
| v. | ) Criminal No. 20-263 |
| | ) |
| DIMETRIUS MORRIS, | ) |
| | ) Judge Robert J. Colville |
| | ) |

**MEMORANDUM OPINION**

Robert J. Colville, United States District Judge

Before the Court is the Motion to Suppress Evidence (ECF No. 43) filed by Defendant Dimetrius Morris. Defendant seeks to suppress all evidence obtained as a result of what he asserts was an unlawful, and unlawfully extended, traffic stop, as well as any other evidence the Government intends to introduce that was obtained as fruits of this purportedly tainted encounter. The Motion to Suppress has been fully briefed and is ripe for disposition.

**I.  Procedural History**

Defendant was arraigned on January 6, 2022 on an Indictment charging him with violations of 21 U.S.C. §§ 841 (a)(1) and 841 (b)(1)(C) (Possession with Intent to Distribute Quantities of Cocaine, Fentanyl, and Methamphetamine); 18 U.S.C. §924 (c)(1)(A)(i) (Possession of a Firearm in Furtherance of a Drug Trafficking Crime); and 18 U.S.C. §922 (g)(1) (Possession of a Firearm

1

by a Convicted Felon). Defendant filed his Motion to Suppress on February 21, 2023, alongside several other pretrial motions that have already been addressed by the Court. The Government filed a Response (ECF No. 44) to the Motion to Suppress on March 14, 2023, and the Defendant filed a Reply (ECF No. 45) on March 21, 2023.

The Court held a hearing on the Motion to Suppress on April 21, 2023. During that hearing, the Government offered the testimony of Corporal Joseph Zajac, the officer who conducted the traffic stop at issue in the Motion to Suppress. The Defendant called Bianca D'Auria, an investigator with the Federal Public Defender's Office for the Western District of Pennsylvania, to testify. The Government introduced one exhibit during the hearing, a photograph of the license plate area of Defendant's car that was taken at the time of the traffic stop (Ex. 1). The Defense also introduced one exhibit, which consisted of four photographs taken by Ms. D'Auria in April of 2023 depicting, from different angles and distances, the intersection wherein Corporal Zajac initiated the traffic stop.

At the conclusion of the hearing, the Defense requested to submit supplemental briefing, and the Court subsequently entered an Order (ECF No. 48) providing deadlines for supplemental briefs and responses thereto. On July 5, 2023, the Government filed its Supplemental Brief (ECF No. 52), and Defendant filed his Supplemental Brief and Proposed Findings of Fact (ECF No. 53). The Government filed its Response (ECF No. 54) to Defendant's Supplemental Brief on July 5, 2023. Defendant filed his Response (ECF No. 55) to the Government's Supplemental Brief on July 26, 2023.

## II.   Legal Standard

The Fourth Amendment protects individuals from "unreasonable searches and seizures" of their "persons, houses, papers, and effects." U.S. Const. amend. IV. Subject to certain exceptions,

evidence obtained through unreasonable searches and seizures must be suppressed as "fruit of the poisonous tree." *United States v. Bey*, 911 F.3d 139, 144 (3d Cir. 2018). "A traffic stop is a 'seizure' within the meaning of the Fourth Amendment, 'even though the purpose of the stop is limited and the resulting detention quite brief.'" *United States v. Delfin-Colina*, 464 F.3d 392, 396 (3d Cir. 2006) (quoting *Delaware v. Prouse,* 440 U.S. 648, 653 (1979)). "Because an ordinary traffic stop is analogous to an investigative detention, it has been historically reviewed under the investigatory detention framework first articulated in *Terry v. Ohio*, 392 U.S. 1, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968)." *Id*.

> With respect to traffic stops generally, the Third Circuit has explained:
>
> Taken together, then, *Terry* and [*Whren v. United States,* 517 U.S. 806 (1996)] stand for the proposition that a traffic stop will be deemed a reasonable "seizure" when an objective review of the facts shows that an officer possessed specific, articulable facts that an individual was violating a traffic law at the time of the stop. In other words, an officer need not be factually accurate in her belief that a traffic law had been violated but, instead, need only produce facts establishing that she reasonably believed that a violation had taken place. Consequently, a reasonable mistake of fact "does not violate the Fourth Amendment." [*United States v. Chanthasouxat*, 342 F.3d 1271, 1275 (11th Cir.2003)]; *see also Illinois v. Rodriguez,* 497 U.S. 177, 185, 110 S.Ct. 2793, 111 L.Ed.2d 148 (1990) (noting that factual determinations made by government agents need not "always be correct," but they always have to be "reasonable"); *United States v. Tibbetts,* 396 F.3d 1132, 1138 (10th Cir. 2005).

*Delfin-Colina*, 464 F.3d at 396–97 (footnote omitted). With respect to traffic stops that are extended, the Supreme Court of the United States has explained:

> Here, the initial seizure of respondent when he was stopped on the highway was based on probable cause and was concededly lawful. It is nevertheless clear that a seizure that is lawful at its inception can violate the Fourth Amendment if its manner of execution unreasonably infringes interests protected by the Constitution. *United States v. Jacobsen*, 466 U.S. 109, 124, 104 S.Ct. 1652, 80 L.Ed.2d 85 (1984). A seizure that is justified solely by the interest in issuing a warning ticket to the driver can become unlawful if it is prolonged beyond the time reasonably required to complete that mission.

*Illinois v. Caballes*, 543 U.S. 405, 407–08 (2005); *see also Rodriguez v. United States*, 575 U.S. 348, 354 (2015) ("Like a *Terry* stop, the tolerable duration of police inquiries in the traffic-stop context is determined by the seizure's 'mission'—to address the traffic violation that warranted the stop, *Caballes*, 543 U.S., at 407, 125 S.Ct. 834, and attend to related safety concerns.").

### III.   Factual Findings

Following the hearing in this matter, and further following review of the Transcript (ECF No. 56) of the hearing and the parties' submissions, the Court makes the following findings of fact:

While on patrol at around 12:30 a.m. on February 20, 2020, Corporal Zajac was traveling southbound on Stambaugh Street in Sharon, Pennsylvania in his marked police vehicle when he observed a Toyota Corolla traveling in the same direction approximately three to four car lengths ahead of Corporal Zajac's vehicle. Tr. 8:24-10:14, ECF No. 56. Corporal Zajac was the only occupant of the police vehicle at that time. *Id*. As his vehicle closed the distance to the Corolla, Corporal Zajac observed that the license plate light on the driver's side of the Corolla was not properly functioning, and, more specifically, observed that this light was not illuminated in any manner. *Id.* at 10:15-11:1; 15:7-21. The license plate light on the passenger's side of the Corolla was lit. *Id.* at 11:2-3. Corporal Zajac interpreted the malfunctioning of the driver's side license plate light to be a violation of the Pennsylvania Vehicle Code. *Id.* at 11:4-9.

The Toyota Corolla eventually stopped at a stop sign, and subsequently turned left onto Division Street. Tr. 11:10-18, ECF No. 56. Corporal Zajac followed the Corolla onto Division Street. *Id.* at 27:10-18. At that time, Corporal Zajac activated his overhead lights to initiate a traffic stop of the Corolla. *Id.* at 11:19-24. The Corolla pulled over to a gas station/convenience store, at which time Corporal Zajac also noticed that the center brake light of the vehicle was not

4

functioning. *Id.* at 12:2-16. At that time, and in addition to the headlights of the two vehicles, there was light emanating from the convenience store and a nearby streetlight. *Id.* 12:8-14. Corporal Zajac inspected and confirmed that the license plate light on the driver's side of the Corolla was not illuminated, and, upon inspection, believed the light to be factory equipment. *Id.* at 15:7-21.

Corporal Zajac approached the Toyota Corolla on the driver's side of the vehicle, at which time he observed that the occupants of the vehicle were three adult males, including Defendant, who was seated in the front passenger seat. Tr. 16:5-25, ECF No. 56. Corporal Zajac was not accompanied by another officer as he approached the vehicle. *Id.* at 16:17-18. The driver's side window of the Corolla was down as Corporal Zajac approached, and, upon reaching the window, Corporal Zajac detected the odor of both loose-leaf marijuana and burning marijuana. *Id.* at 17:1-22; 33:9-25.

Corporal Zajac asked the driver of the Toyota Corolla for his driver's license, registration, and proof of insurance, and asked the other occupants, including Defendant, for their IDs. Tr. 18:1-12, ECF No. 56. The passengers promptly provided their IDs or identifying information to Corporal Zajac. *Id.* at 18:16-23. The driver of the car was unable to provide proof of insurance at any point during the stop. *Id.* at 18:24-19:3. Corporal Zajac requested identifying information from the passengers of the vehicle as a matter of officer safety concern, as he was outnumbered three to one at that juncture and felt that it would be beneficial to know if any of the individuals had outstanding warrants so that he could request backup if he thought it appropriate. *Id.* at 19:4-16.

Shortly after requesting the passengers' identification, Corporal Zazado arrived as backup, approached the Toyota Corolla, and informed Corporal Zajac that he also detected the smell of

5

marijuana emanating from the vehicle. Tr. 19:17-20:10, ECF No. 56. While he did not ask immediately, Corporal Zazado eventually asked the occupants of the Corolla about marijuana. *Id.* at 20:11-16. In response, the backseat passenger produced a joint, and the Defendant, who, again, was in the front passenger seat, informed the Corporal that he had just smoked marijuana in Youngstown, Ohio. *Id.* at 20:17-21:7. After this interaction, Corporal Zajac returned to his police vehicle to run the information of the Corolla's occupants through dispatch. *Id.* at 21:16-22. The time from when Corporal Zajac approached the Corolla to the time he returned to his police vehicle to check the occupants' information was approximately two to three minutes. *Id.* at 22:16-22:3.

None of the Corolla's occupants had outstanding warrants. Tr. 31:11-15, ECF No. 56. Upon checking the registration provided by the driver of the Corolla, Corporal Zajac learned that the registration did not match the Toyota Corolla and, accordingly, that the license plate attached to the Corolla was not the proper license plate for the vehicle. *Id.* at 22:4-23:6. While the registration issue was eventually resolved by the driver producing the correct (though temporary and expired) registration for the Corolla, the driver of the vehicle never produced proof of insurance. *Id.* at 23:14-24:7. After checking the occupants' information, Corporal Zajac returned to the Corolla and ordered both the driver and Defendant out the vehicle. *Id.* at 31:16-22. Corporal Zajac patted both the driver and Defendant for weapons. *Id.* at 31:23-32:6. While the Defendant was being patted down, officers located a handgun underneath the passenger seat of the car, and the Defendant was subsequently placed in handcuffs. Mot. ¶ 9, ECF No. 43; *see also* ECF No. 43-1. Eventually, each of the three occupants of the Corolla were taken to the police station by the officers. Tr. 32:7-9, ECF No. 56. At the conclusion of the traffic stop, the Corolla remained at the gas station parking lot and was not driven away. *Id.* at 23:10-13. During a search of the vehicle, officers located a burnt joint and unsmoked marijuana. *Id.* at 34:4-6. Defendant was

subsequently searched incident to arrest and additional items of contraband, and specifically multiple baggies of suspected crack cocaine and powder cocaine, oval shaped pills, and $888.00 in cash, were found on the Defendant's person.  Mot. ¶ 10, ECF No. 43; *see also* ECF No. 43-1.

The night of February 20, 2020 was a cold and clear night, with no inclement weather.  Tr. 24:13-24.  Both Stambaugh Street and Division Street are generally busy streets at certain times of the day.  *Id.* at 24:12-18.  There are streetlights, businesses, and homes on each street.  *Id.* at 25:9-26:15.  The intersection of Stambaugh Street and Division Street is fairly well-traveled, and there are streetlights in all four quadrants of the intersection.  *Id.* at 26:1-12.  The eastbound section of Division Street that Ms. D'Auria observed is well-lit.  *Id.* at 42:25-43:4.  When Ms. D'Auria visited the intersection in April of 2023, the lighting in the area was sufficient for her to visually observe the license plates of vehicles that had license plate lights, those that did not, and those that had license plate covers.  *Id.* at 39:4-16.  Her headlights also were sufficient to allow her to visually observe the license plates, including the numbers and state identification on the license plate, of vehicles that were two to three car lengths in front of her vehicle, even if the other vehicle did not have functioning license plate lights.  *Id.* at 39:17-40:16.

**IV.     Discussion**

The Motion to Suppress presents two issues for the Court's consideration: (1) whether the initial traffic stop of the Toyota Corolla was lawful; and (2) even if the traffic stop was initially lawful, whether it was unlawfully extended.

Defendant first argues that Corporal Zajac lacked reasonable suspicion to initiate a traffic stop of the Toyota Corolla on the night in question.  "It is well-established that a traffic stop is lawful under the Fourth Amendment where a police officer observes a violation of the state traffic regulations."  *United States v. Moorefield*, 111 F.3d 10, 12 (3d Cir. 1997).  "[T]he *Terry* reasonable

suspicion standard applies to routine traffic stops." *Delfin-Colina*, 464 F.3d at 397. "Though reasonable suspicion is a generally undemanding standard, a police officer does have the initial burden of providing the 'specific, articulable facts' to justify a reasonable suspicion to believe that an individual has violated the traffic laws." *Id.* The reviewing court "must consider whether the 'rational interferences from those facts reasonably warrant [the] intrusion.'" *Id.* (quoting *Terry*, 392 U.S. at 21).

In this case, the parties' disagreement with respect to the initiation of the traffic stop turns on an interpretation of the relevant traffic regulation as opposed to the facts, as it is uncontested that Corporal Zajac observed that the license plate light on the driver's side of the Corolla was not properly functioning, and, more specifically, observed that the light was not illuminated in any manner. In arguing that Corporal Zajac lacked reasonable suspicion to initiate the stop, Defendant argues:

> For Zajac to consider whether to stop the car for this type of traffic infraction, the proper question he must ask himself is not "Is the light malfunctioning?" but rather, "Is the light malfunctioning in a way such that the plate is not visible from 50 feet away?"

Mot. 4, ECF No. 43. Defendant further argues that, "[i]n this case, because Zajac was incorrect on what the relevant law was and how it should be applied, he lacked specificity in his observations, and as a result he acted illegally." *Id.* at 5.

With respect to rear lighting requirements for vehicles, Pennsylvania law requires that:

> Every vehicle operated on a highway shall be equipped with a rear lighting system including, but not limited to, rear lamps, rear reflectors, stop lamps *and license plate light*, in conformance with regulations of the department. If a vehicle is equipped with a centrally mounted rear stop light, a decal or overlay may be affixed to the centrally mounted rear stop light if the decal or overlay meets all applicable State and Federal regulations.

75 Pa.C.S. § 4303(b) (emphasis added). "If the vehicle was originally so equipped, the registration plate lamp shall emit white light and make the registration plate visible from distance of 50 feet to the rear of the vehicle." 67 Pa. Code § 175.66(k). Under Pennsylvania law, a vehicle offered for inspection should be rejected where: "[a]n exterior bulb or sealed beam, if originally equipped or installed, fails to light properly, except ornamental lights." 67 Pa. Code § 175.80(a)(9)(i); *see also Commonwealth v. Salter*, 121 A.3d 987, 993 (Pa. Super. 2015) ("Department regulations at 67 Pa.Code §§ 175.80(a)(9)(i) and 175.66(k) provide a vehicle is not in compliance with the Vehicle Code if '[a]n exterior bulb or sealed beam, if originally equipped or installed, fails to light properly,' and 'the registration plate lamp shall emit white light and make the registration plate visible from [a] distance of 50 feet to the rear of the vehicle.'").

>The Third Circuit has explained:
>
>A mistake of law [by a police officer] is only unreasonable when the officer does not offer facts that objectively show that the identified law was actually broken. In situations where an objective review of the record evidence establishes reasonable grounds to conclude that the stopped individual has in fact violated the traffic-code provision cited by the officer, the stop is constitutional even if the officer is mistaken about the scope of activities actually proscribed by the cited traffic-code provision. Therefore an officer's Fourth Amendment burden of production is to (1) identify the ordinance or statute that he believed had been violated, and (2) provide specific, articulable facts that support an objective determination of whether any officer could have possessed reasonable suspicion of the alleged infraction. As long as both prongs are met, an officer's subjective understanding of the law at issue would not be relevant to the court's determination.

*Delfin-Colina*, 464 F.3d at 399-400.

In the Court's estimation, Defendant's argument respecting the initiation of the traffic stop is based on a faulty premise. Pennsylvania law requires that, "[i]f the vehicle was originally so equipped, the registration plate lamp shall emit white light *and* make the registration plate visible from distance of 50 feet to the rear of the vehicle." 67 Pa. Code § 175.66(k) (emphasis added). Corporal Zajac testified that one of the registration plate lamps on the Toyota Corolla did not emit

9

white light, and that it thus failed to light properly.  The visibility requirement is separate and apart from the requirement that a registration plate light emit white light.  The fact that the driver's side license plate light was out, and thus was not emitting white light, is alone sufficient to support the conclusion that Corporal Zajac had reasonable suspicion to initiate the traffic stop for a violation of the Pennsylvania traffic code.  The following argument from the Government is well-taken by the Court: "A car being driven without a functioning license-plate light does not bounce into and out of compliance with the Pennsylvania Vehicle Code from moment to moment depending on mercurial external factors like lighting conditions and vantage points."  ECF No. 54 at 2.

In so holding, the Court disagrees with the Superior Court of Pennsylvania's non-precedential decision in *Commonwealth v. Banks*, 2016 WL 1658122 (Pa. Super., Apr. 26, 2016) (finding officer lacked probable cause for a traffic stop where only one of the two license plates lamps was malfunctioning).  Rather, the Court agrees with the dissent's statement in that case, and with the Superior Court's subsequent non-precedential holding in *Commonwealth v. Marx*.  *See Banks*, 2016 WL 1658122, at *6 (Stevens, P.J.E., dissenting) ("The fact that one of the bulbs remained operational does not negate the requirement of Section 4303(b) of the Vehicle Code and department regulations that a light originally equipped on a motor vehicle must be in proper working order."); *see also Commonwealth v. Marx*, 236 A.3d 1087 (Pa. Super. 2020) ("Contrary to appellant's contention, the fact that one of the license plate lamps on his vehicle remained operational does not negate the requirement of Section 4303(b) and the department regulations referenced therein that a light 'originally equipped or installed' on a motor vehicle must be in full working order." (citations omitted)).  Corporal Zajac observed that the Corolla's driver's side license plate light was not in full working order, and thus had reasonable suspicion to initiate the traffic stop for a violation of the Pennsylvania traffic code.

Turning to the issue of whether the traffic stop at issue was unlawfully extended, Defendant's assertion requires the Court to first decide whether and when the stop was extended, and then to determine whether, at that point, the extension was justified by reasonable suspicion of criminal activity. *United States v. Green*, 897 F.3d 173, 178 (3d Cir. 2018). Defendant argues that the stop was unreasonably extended when Corporal Zajac requested identification from the passengers of the Toyota Corolla. Mot. 5, ECF No. 43.

"An unreasonable extension occurs when an officer, without reasonable suspicion, diverts from a stop's traffic-based purpose to investigate other crimes." *Green*, 897 F.3d at 179 (citing *Rodriguez v. United States*, 575 U.S. 348, 355 (2015)). "When evaluating whether an officer was on-mission, we consider the legitimate and weighty interest in officer safety and thus will tolerate additional intrusions, such as forcing a driver to get out of a vehicle. This interest, [u]nlike a general interest in criminal enforcement, . . . stems from the mission of the stop itself." *United States v. Hurtt*, 31 F.4th 152, 160 (3d Cir. 2022) (citations omitted) (footnotes omitted) (internal quotation marks omitted). The Third Circuit has explained:

> What is disputed, however, is when this extension occurred, and whether, at that moment, [the officer] possessed reasonable suspicion in order to justify the extension. In light of *Rodriguez*, we must first determine when the stop was "measurably extend[ed]." *Id.* (quoting *Arizona v. Johnson*, 555 U.S. 323, 333, 129 S.Ct. 781, 172 L.Ed.2d 694 (2009)). After determining when the stop was extended—the "*Rodriguez* moment," so to speak—we can assess whether the facts available to [the officer] at that time were sufficient to establish reasonable suspicion that [defendant] was involved in drug trafficking.
>
> . . . .
>
> . . . *Rodriguez* . . . [held] that, absent reasonable suspicion, any "unrelated inquiries [that] measurably extend the duration of [a] stop" are unlawful. In describing what inquiries qualify as "unrelated," *Rodriguez* drew a distinction between "ordinary inquiries incident to" a traffic stop, which serve the purpose of enforcing the traffic code, and other measures aimed at detecting criminal activity more generally. Actions like "checking the driver's license, determining whether there are outstanding warrants against the driver, and inspecting the automobile's

> registration and proof of insurance" are in the former category of inquiries incident to a traffic stop. A dog sniff, being obviously focused on the enforcement of drug— not traffic—laws, falls in the latter category and cannot, therefore, be performed in a manner that extends the duration of the stop absent reasonable suspicion.

*Green*, 897 F.3d at 179-80 (citations omitted); *see also id.* at 181 ("What we know is that an officer may 'conduct certain unrelated checks,' but not 'in a way that prolongs the stop.'" (quoting *Rodriguez*, 135 S.Ct. at 1615)).

After a court determines what constitutes the "*Rodriguez* moment," i.e., the moment when a traffic stop has been extended beyond the initial purpose of the stop, the court must determine whether the officer has "reasonable suspicion" sufficient to permit extension of the stop. In *Green*, the Third Circuit explained:

> In speaking of reasonable suspicion, our precedents describe more than define the term, which the Supreme Court has characterized as an "elusive concept." *United States v. Cortez*, 449 U.S. 411, 417, 101 S.Ct. 690, 66 L.Ed.2d 621 (1981). Reasonable suspicion is more than "a mere hunch ... [but] considerably less than . . . a preponderance of the evidence, and obviously less than . . . probable cause." [*Navarette v. California*, 134 S.Ct. 1683, 1687 (2014)] (internal quotation marks and citations omitted) (quoting *Cortez*, 449 U.S. at 417, 101 S.Ct. 690; and *Terry v. Ohio*, 392 U.S. 1, 27, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968)). Reasonable suspicion requires only "'a particularized and objective basis' for suspecting ... criminal activity," *Ornelas v. United States*, 517 U.S. 690, 696, 116 S.Ct. 1657, 134 L.Ed.2d 911 (1996) (quoting *Cortez*, 449 U.S. at 417–418, 101 S.Ct. 690), and should not be derived from characteristics common to the "vast majority of innocent" individuals, *Karnes v. Skrutski*, 62 F.3d 485, 494 (3d Cir. 1995).
>
> In applying this standard, courts invoke several common themes. First, reasonable suspicion must always be evaluated under the totality of the circumstances. *Cortez*, 449 U.S. at 417, 101 S.Ct. 690. Accordingly, courts have consistently refused to adopt per se rules declaring a particular factor sufficient or insufficient to establish reasonable suspicion. *See Illinois v. Wardlow*, 528 U.S. 119, 126–27, 120 S.Ct. 673, 145 L.Ed.2d 570 (2000) (Stevens, J., dissenting) (agreeing with the Court's rejection of a per se rule regarding flight from police). Second, when assessing the totality of the circumstances, courts recognize the particular ability of law enforcement officers, based on training and experience, "to make inferences from and deductions about the cumulative information available to them that 'might well elude an untrained person.'" *United States v. Arvizu*, 534 U.S. 266, 273, 122 S.Ct. 744, 151 L.Ed.2d 740 (2002) (quoting *Cortez*, 449 U.S. at 418, 101 S.Ct. 690). Third, and consistent with the totality of the circumstances approach, reasonable

>  suspicion cannot be defeated by a so-called "divide-and-conquer" analysis, whereby each arguably suspicious factor is viewed in isolation and plausible, innocent explanations are offered for each. *District of Columbia v. Wesby*, ⸺ U.S. ⸺, 138 S.Ct. 577, 589, 199 L.Ed.2d 453 (2018). In *Terry* itself, the Court found there was reasonable suspicion to justify the temporary seizures even though each factor relied on by the officer, viewed in isolation, might have seemed perfectly innocent. *Arvizu*, 534 U.S. at 274, 122 S.Ct. 744 (citing *Terry*, 392 U.S. at 22, 88 S.Ct. 1868).

*Green*, 897 F.3d at 183.

The Third Circuit has explained that it is well-settled that a police officer executing a traffic stop for a violation of state traffic laws "may exercise reasonable superintendence over the car and its passengers," and that, under the Supreme Court's decision in *Pennsylvania v. Mimms*, 434 U.S. 106 (1977), an "officer may order the driver out of the vehicle without any particularized suspicion." *United States v. Bonner*, 363 F.3d 213, 216 (3d Cir. 2004). "[A] police officer has the authority and duty to control the vehicle and its occupants, at least for a brief period of time." *Bonner*, 363 F.3d at 217.

The Third Circuit has further explained that, "[a]fter a traffic stop that was justified at its inception, an officer who develops a reasonable, articulable suspicion of criminal activity may expand the scope of an inquiry beyond the reason for the stop and detain the vehicle and its occupants for further investigation." *United States v. Givan*, 320 F.3d 452, 458 (3d Cir. 2003). In analyzing "reasonable suspicion," "great deference" is paid "to the officer's knowledge of the nature and the nuances of the type of criminal activity that he had observed in his experience." *United States v. Nelson*, 284 F.3d 472, 482 (3d Cir. 2002) (citing *United States v. Arvizu*, 534 U.S. 266 (2002)).

Initially, the Court agrees that the traffic stop at issue was not measurably extended by Corporal Zajac's request for the IDs of the Toyota Corolla's passengers because, at the time Corporal Zajac requested the passengers' IDs, the driver of the vehicle was still in the process of

searching for the documents requested of him by Corporal Zajac. During the duration of the stop, the driver was unable to provide proof of insurance, and he also initially provided the incorrect registration for the vehicle before producing expired temporary registration. *See United States v. Burrus*, 402 F. Supp. 3d 116, 124 (W.D. Pa. 2019) ("While he had confirmed that Ms. Donald was unlicensed and that the vehicle was unregistered prior to pulling her over and she admitted to same during their brief discussion, the traffic stop was not finished because Officer Hess could not permit any of the occupants to drive the vehicle away from the scene without further investigation. He also could not leave the vehicle on the side of the road but needed to have a licensed driver pick it up or call for a tow truck to safely remove the vehicle from the road. Certainly, either occurrence would have taken more than the two and a half minutes it took Officer Hess to run the NCIC check on Defendant. Indeed, prior to returning to his police cruiser, Officer Hess was told by the driver that another individual would be picking up the vehicle but that person had not yet arrived. Therefore, Defendant's motion must be denied because the alleged deviation from the mission of the traffic stop did not add any time to the investigation of same." (citations omitted)). Because Corporal Zajac was unable to complete the mission of the stop due to the faulty and incomplete information provided by the Corolla's driver, Corporal Zajac did not measurably extend the stop by requesting the passengers' IDs or running their information through a database.

Further, the Court will join Judges Gibson, Fischer, and Horan of this District in holding that "regardless of the timing of events, 'most courts confronted with the issue have determined that checking a passenger's driver's license in addition to the vehicle driver's license is not an impermissible extension of a traffic stop.'" *Burrus*, 402 F. Supp. 3d at 124 (quoting *United States v. Terry*, No. 3:18-CR-24, 2019 WL 2176330, at *15 (W.D. Pa. May 20, 2019)); *see also id.* ("As Judge Gibson persuasively explains in *Terry*, with numerous citations of relevant authority,

'[s]ome courts have held that checking a passenger's identification during a traffic stop is appropriate because it is necessary to ensure officer safety, which is part of the "mission" of a traffic stop,' while '[o]ther courts have determined that checking a passenger's license is permissible because it is a normal inquiry related to addressing a traffic violation[.]'"); *United States v. Eddings*, No. CR 21-117, 2023 WL 1775705, at *11 (W.D. Pa. Feb. 6, 2023) ("The Court concludes that Officer Wagner was justified in requesting the passenger's identification and conducting warrant checks because the circumstances of the traffic stop known to Officer Wagner as he approached the passenger side of the vehicle heightened the need to ensure his safety.").

The totality of the circumstances presented herein, where the traffic stop was initiated in the middle of the night, where Corporal Zajac was outnumbered by the occupants of the Corolla three to one, and where the driver of the Corolla was unable to produce the appropriate registration for the vehicle or proof of insurance, support a finding that Corporal Zajac's minimally invasive request for the Corolla's passengers' identification was supported by legitimate officer safety rationale. Corporal Zajac testified that he requested identifying information from the passengers of the vehicle as a matter of officer safety concern, as he was outnumbered three to one at that juncture and felt that it would be beneficial to know if any of the individuals in the Corolla had outstanding warrants so that he could request backup if he thought it appropriate. Tr. 19:4-16, ECF No. 56. For the reasons discussed above, the Court finds that Corporal Zajac's actions neither deviated from the mission of the traffic stop nor measurably extended the stop.

Finally, even if the traffic stop was extended, it was not unlawfully extended. Corporal Zajac possessed reasonable suspicion to extend the traffic stop based upon his testimony that he smelled marijuana immediately upon approaching the Corolla, and further following Defendant's admission that he had smoked marijuana and the backseat passenger's production of a joint. *See*

*United States v. Ramos*, 47 V.I. 755, 759, 443 F.3d 304, 308 (3d Cir. 2006) ("It is well settled that the smell of marijuana alone, if articulable and particularized, may establish not merely reasonable suspicion, but probable cause." (citing *United States v. Humphries*, 372 F.3d 653, 658 (4th Cir. 2004)); *see also United States v. Jones*, 952 F.3d 153, 157 (4th Cir. 2020) (affirming district court where district court "indicated that the officers' immediate detection of the marijuana odor when Jones opened the door was alone sufficient to establish probable cause that the house contained evidence of marijuana possession."). Corporal Zajac and Corporal Zazado each detected the smell of marijuana upon approaching the Corolla, and thus possessed probable cause, in addition to reasonable suspicion, to extend the traffic stop, which the Court has already held was lawful at its inception.

**V.    Conclusion**

For the reasons discussed above, the Court will deny Defendant's Motion to Suppress. An appropriate Order of Court follows.

BY THE COURT:

*/s/Robert J. Colville*
Robert J. Colville
United States District Judge

DATED: August 30, 2023

cc: All counsel of record